
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77514-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| I.H., | ) | |
| B.D. 07/09/02, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 8, 2018 |

SCHINDLER, J. — The juvenile court found I.H. guilty of assault in the first degree in violation of RCW 9A.36.011(1)(a). I.H. contends the waiver of his Miranda[1] rights was not valid and the court erred in concluding the statements to the police were knowing, intelligent, and voluntary. We affirm but remand to correct a clerical error in the order on disposition.

## FACTS

On October 31, 2016, Camille James and her boyfriend Jeffery Bakker took turns answering the front door for Halloween trick-or-treaters. At approximately 9:00 p.m., the doorbell rang several times, "very fast and very repetitive." But when James opened the door, no one was there. After shutting the door, James "saw a figure" through the

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

window and opened the door. A young black male, later identified as 14-year-old I.H., was standing at the door "wearing dark jeans and a grey and black hoody."

I.H. was "standing in front of [James] with his arms behind his back and his head down." James said the boy looked up and they "made eye contact." When James held out the bowl of candy, I.H. stabbed James on her right side with a knife and ran away. At first, James thought I.H. punched her, but she "felt a sharper pain and I knew that I had been stabbed."

Bakker called 911. The medics arrived quickly. James remained at Harborview Medical Center for approximately three days. Federal Way Police Department detectives showed James three different photomontages. James did not recognize anyone in two of the photomontages. James "picked somebody out" in the third photomontage but she "wasn't positive" if it was the person who stabbed her.

The next day on November 1, I.H. told his friend C.S. that "he stabbed somebody." C.S. "didn't really believe him" at first. C.S. found an article about a stabbing and sent it to I.H. on Facebook. Later that afternoon, his guitar teacher talked about "something on the news about a stabbing on Halloween." C.S. later told his father that I.H. stabbed someone on Halloween.

C.S.'s father called 911 on November 3 to report the stabbing and the police interviewed C.S. At approximately midnight on November 3, the police arrested I.H. I.H. was asleep and wearing pants but no shirt. The police placed I.H. in an interrogation room and put shackles on his ankles.

Detective Kris Durell read I.H. Miranda[2] rights and juvenile warnings. Detective

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Matthew Novak and Detective Durell interviewed I.H. for approximately an hour and a half. The interview was audio and video recorded.

I.H. told the detectives he went to school at "Sequoia" and took classes in science, language arts, math, physical education, social studies, and Digitech, a class for programming and "typing and writing codes."

I.H. told the detectives he was at home on Halloween and "watch[ed] Netflix" with his mom and sisters. Detective Durell asked about what I.H. told his friend C.S. at school. I.H. admitted he "stabbed someone." I.H. described the person he stabbed as a white woman who "had glasses and . . . looks like she was in her 40s or . . . 30s." I.H. said he had the knife "behind my back." I.H. said the woman was handing out "Kit Kats and Reeses." I.H. said he "stabbed her . . . because she didn't have the candy I wanted, and so I got mad, and so I just stabbed her."

I.H. stood up and showed the detectives how he took out his "eight-inch stainless steel Good Cook butcher knife" and stabbed the woman once "in her stomach." After she "screamed," he left. I.H. said, "[W]hen you stab someone," they "bleed and it could be fatal at times."

I.H. told the detectives he "threw [the knife] into . . . this pond." I.H. said he was wearing a "zip up hoodie" that had "gray . . . around the torso and then the sleeves were . . . all black." I.H. said the sweatshirt was "hanging up" in his bedroom.

The detectives submitted an affidavit in support of a warrant to search the condominium. A judge authorized the search. When the police executed the search warrant, they found a black and grey sweatshirt and a "large Good Cook knife" in "a suitcase" near the bed where I.H. slept.

The police showed James a photomontage that included I.H. James identified I.H. as the young man who stabbed her. James was "100 percent" confident.

Washington State Patrol Criminal Laboratory (WSPCL) forensic examiner Rebecca Neyhart tested the DNA[3] on the Good Cook knife. The DNA matched the DNA profiles of I.H. and James.

The State charged I.H. in juvenile court with assault in the first degree in violation of RCW 9A.36.011(1)(a) and (c). The State alleged that I.H., "with intent to inflict great bodily harm, did assault Camille James with a deadly weapon and force and means likely to produce great bodily harm or death, to wit: a stab wound, and did inflict great bodily harm upon Camille James." I.H. pleaded not guilty.

I.H. filed a motion to suppress the statements he made to the police. The court held a CrR 3.5 hearing. Detective Novak, Detective Durell, and I.H. testified at the hearing. The court admitted into evidence and reviewed the audio and video recording of the November 4 interview.

Detective Durell testified that I.H. did not "ever appear to be confused about his rights" and "agree[d] to talk." Detective Durell said I.H. did not "do anything to indicate that he wished to invoke his rights." Detective Durell testified that I.H. "talked about liking to read" and said he "read Robert Mills . . . and nonfiction." Detective Durell said that when I.H. was "telling [him] the details of this incident," I.H. "appeared to just be replaying the incident kind of detached from it."

I.H. testified that he "was asleep" when the police "woke me up" and "took me to the police station." I.H. testified he believed he "could tell [the detective] that . . . [he] didn't understand all of" his rights but he did not say anything because he "just wanted

_____
[3] Deoxyribonucleic acid.

to . . . get on with it." I.H. did not "remember being cold" in the interview room and said he "wore shorts and a tee shirt to school that day."

On cross-examination, I.H. testified that he was "honest with" the detectives when he talked to them. When asked whether he was "honest when you said that you stabbed . . . James," I.H. testified he was "honest about some of it."

The court ruled I.H. knowingly, intelligently, and voluntarily waived his Miranda rights and his statements were admissible at trial. The court entered written CrR 3.5 findings of fact and conclusions of law.

The court found that I.H. was subject to a custodial interrogation. The court found I.H. "was properly advised of his Miranda warnings prior to making any statements, waived his rights explicitly, and made all statements voluntarily." The findings state that the detectives asked "primarily open-ended questions," that I.H. answered the questions "clearly," and that I.H.'s actions and answers "demonstrated that he was articulate . . . and able to understand detectives' questions." The findings state, "The court finds that there were no threats or promises made by the detectives, that [I.H.] was not forced in any way to speak with them, and that the conditions under which [I.H.] spoke did not render the statements involuntary." The findings state I.H. "testified that being shirtless did not make him cold or uncomfortable." The court found that the police shackled I.H.'s ankles to the floor but left his hands "unrestricted." The court "did not observe any physical discomfort during the course of [I.H.]'s interrogation."

James, C.S., Detective Durell, WSPCL forensic examiner Neyhart, and Dr. Heather Evans testified during the fact-finding hearing. The court admitted the audio

5

and video recording of the police interview with I.H. and a transcript of the recording into evidence.

WSPCL forensic examiner Neyhart testified that the DNA found on the Good Cook knife matched the DNA profiles of James and I.H. Neyhart said it is "7.3 octillion times more likely that the observed major profile was a result of a mixture of [I.H.] and Camille James than it having originated from [I.H.] and an unrelated individual selected at random." Dr. Evans testified that James sustained a "three-centimeter laceration" of the fifth rib on her right side.

I.H.'s sister S.H. and a defense investigator testified for the defense. S.H. testified I.H. was at home on October 31 and they watched television. S.H. said I.H. went to bed at "9:00, 9:15" p.m. and when she went downstairs to "get some water" at "around 11:00, 11:30" p.m., she "saw [I.H.] . . . sleeping."

The defense investigator testified that local news articles described the victim of a stabbing on Halloween and included photographs of a "treat-or-trick bowl" with "Reese's and Kit Kats." On cross-examination, the investigator admitted the articles did not describe the race, height, or clothes of the victim or "say anything about her wearing glasses."

The court found I.H. guilty of assault with a deadly weapon with the intent to produce great bodily harm or death in violation of RCW 9A.36.011(a).

## ANALYSIS

I.H. contends his waiver was not valid because a parent, attorney, or other interested party was not present during the police interview. I.H. cites a number of out-

of-state cases and studies to argue the court should "adopt additional safeguards" and require the presence of a parent or advocate during police interrogation of a juvenile.[4] We adhere to the Washington Supreme Court decision in Dutil v. State, 93 Wn.2d 84, 606 P.2d 269 (1980).

It is well established that before conducting a custodial interrogation, the police must advise a suspect of (1) the right to remain silent and provide notice that anything said to the police might be used against him, (2) the right to consult with an attorney prior to answering any questions and have the attorney present for questioning, (3) counsel will be appointed for him if requested, and (4) he can end questioning at any time. Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In In re Gault, 387 U.S. 1, 55, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967), the United States Supreme Court held the constitutional privilege against self-incrimination under Miranda applies with equal force to juveniles. RCW 13.40.140(8) also states that a juvenile "shall be accorded the same privilege against self-incrimination as an adult." Under RCW 13.40.140(11), a parent or guardian "shall give any waiver" for a child under 12 years of age. By contrast, a juvenile who is "at least twelve years of age" may waive his rights without the consent of a parent. RCW 13.40.140(11), (10).

In Dutil, the petitioners argued that a parent or advocate must be present for any juvenile to be "deemed capable of knowingly and intelligently waiving his rights." Dutil, 93 Wn.2d at 86. Citing RCW 13.40.140(10) and (11),[5] the Washington Supreme Court

---

[4] I.H. also cites King County Code (KCC) 2.62.020(A). KCC 2.62.020(A) prohibits only the "department of adult and juvenile detention . . . from allowing custodial interrogation and the waiver of any Miranda rights until after a juvenile consults with an attorney" and "[t]he consultation may not be waived." (Emphasis added.)

[5] The statutes cited in Dutil were former RCW 13.40.140(9) and (10) (1977). Although the subsection numbers changed, the language of the statute has not changed.

disagreed:

> The legislature has found that a child under 12 is incapable of intelligently waiving his rights in a juvenile proceeding, but it has chosen to leave that question to be determined upon the facts of the individual case, where the juvenile is closer to the age of majority.

Dutil, 93 Wn.2d at 91, 94. The Supreme Court held the "totality of circumstances test" applies to juveniles over the age of 12. Dutil, 93 Wn.2d at 93-94.

> Under the totality of circumstances approach, the determination of whether a knowing and intelligent waiver has been made is the responsibility of the juvenile judge, who is presumably experienced in handling juvenile cases and who has the child and other witnesses before him, as well as the facts pertaining to the child's age, intelligence, education and experience.

Dutil, 93 Wn.2d at 89.

I.H. also contends substantial evidence does not support the conclusion that he knowingly, intelligently, and voluntarily waived his Miranda rights.

"[C]hallenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, where the findings are unchallenged, they are verities on appeal." State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). If the findings are supported by substantial evidence, we review de novo whether the findings of fact support the conclusions of law. State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999), abrogated on other grounds by Brendlin v. California, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007); State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

The State must prove voluntariness by a preponderance of the evidence. State v. Braun, 82 Wn.2d 157, 162, 509 P.2d 742 (1973). The court determines whether a juvenile knowingly and voluntarily waived his Miranda rights by considering the "totality of the circumstances." Fare v. Michael C., 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979); State v. Jones, 95 Wn.2d 616, 625, 628 P.2d 472 (1981).

> "The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."

Jones, 95 Wn.2d at 625 (quoting Fare, 442 U.S. at 725). A voluntary statement is one that is the product of the defendant's own free will and judgment. State v. Unga, 165 Wn.2d 95, 102, 196 P.3d 645 (2008).

"Any police interview of an individual suspected of a crime has 'coercive aspects to it.' " J. D. B. v. North Carolina, 564 U.S. 261, 268, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)). A confession induced by threats or promises that overbear the defendant's will constitute coercion and the court must exclude it. Unga, 165 Wn.2d at 101-02. We may conclude I.H. waived his Miranda rights if the totality of the circumstances surrounding the interrogation show " 'an uncoerced choice and the requisite level of comprehension.' " State v. Mayer, 184 Wn.2d 548, 556, 362 P.3d 745 (2015)[6] (quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).

Substantial evidence supports the finding that shackling I.H.'s ankles was not significant to finding voluntariness. The unchallenged findings support the court's

---

[6] Internal quotation marks omitted.

conclusion that I.H. knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights. <u>O'Neill</u>, 148 Wn.2d at 571. The court found that although the detectives "did not pause after each right" was read to I.H., the detectives read I.H. his <u>Miranda</u> rights and juvenile warnings "in a normal conversational tone and pace." The unchallenged findings state that I.H. "answered 'yes' when asked if he understood" his rights "and 'yes' when asked if he was willing to speak to detectives." The video shows I.H. is attentive and talkative throughout the interview. The unchallenged findings state that I.H. understood the detectives' questions and "answered clearly." The video shows I.H. answered the detectives' questions clearly and articulately and informed the detectives when he did not understand a question. The court noted that I.H. "was held back a grade" but found that he was an "articulate" 14-year-old who "enjoyed reading graphic novels." The court found that "[t]here was nothing tricky about the interrogation." The court found that the detectives did not pressure I.H., raise their voices, or suggest "knowledge of information that they did not actually possess."

I.H. assigns error to only the following finding of fact:

> During the interrogation, Respondent's ankles were shackled to the floor while his hands were unrestricted. Given the nature of the crime of which Respondent was accused, this fact is not significant to a finding of voluntariness.

There is no dispute that assault in the first degree is a serious violent crime. Although his ankles were shackled, the video shows I.H. was not "cold or uncomfortable" and his hands are unrestrained. I.H. stands up without difficulty to show the detectives how he stabbed James.

Because the totality of the circumstances surrounding the interrogation show an uncoerced choice and the requisite level of comprehension, we conclude the court did

not err in concluding I.H. knowingly, intelligently, and voluntarily waived his Miranda rights.

However, even if we assume error, the admission of statements in violation of Miranda is harmless if we are convinced beyond a reasonable doubt that a reasonable trier of fact would have reached the same result without the error. Mayer, 184 Wn.2d at 566. "[I]f trial error is of constitutional magnitude, prejudice is presumed and the State bears the burden of proving it was harmless beyond a reasonable doubt." State v. Coristine, 177 Wn.2d 370, 380, 300 P.3d 400 (2013) (citing Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). An error is harmless beyond a reasonable doubt if the untainted evidence is so overwhelming that it necessarily leads to the same outcome. Mayer, 184 Wn.2d at 566.

We conclude beyond a reasonable doubt that without regard to I.H.'s confession, the court would have reached the same conclusion and found that I.H. assaulted James with a deadly weapon with the intent to produce great bodily harm.

James accurately identified the grey and black sweatshirt I.H. was wearing when he stabbed her. When the police showed James the photomontage with I.H., she was "100 percent" confident that he was the person who stabbed her with a knife on Halloween. C.S. testified that I.H. said that he stabbed somebody. The police seized a black and grey sweatshirt and located an eight-inch "Good Cook" butcher knife next to I.H.'s bed. WSPCL forensic scientist Neyhart testified that the DNA on the knife matched the DNA profiles of I.H. and James. The court found the eight-inch knife "is a significant weapon" and concluded there "was no other possible intent in this particular case . . . other than to cause great bodily harm to Ms. James."

11

I.H. contends and the State concedes we should remand to correct an error in the order of disposition. We accept the concession as well taken. The State charged I.H. with assault in the first degree under RCW 9A.36.011(1)(a) and (c). The court found I.H. guilty of assault with a deadly weapon with the intent to produce great bodily harm or death in violation of RCW 9A.36.011(1)(a). However, the order on disposition states that I.H. is guilty of "Assault in the First Degree, pursuant to RCW 9A.36.011(1)(a)(c)." We remand to correct the clerical error in the order on disposition. See CrR 7.8(a); RAP 7.2(e); State v. Davis, 160 Wn. App. 471, 478, 248 P.3d 121 (2011).

We affirm the conviction but remand to correct the clerical error in the order on disposition.

WE CONCUR: