IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79725-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| M.P., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — M.P. challenges her conviction for disclosing intimate images of another minor, arguing that her Miranda[1] waiver was invalid because she was only 13 years old at the time of her custodial interview and did not have an attorney, parent, or other adult advocate present. Because Washington law allows minors over the age of 12 to waive their Miranda rights without the consent of a parent or guardian and the evidence supports the trial court's finding that M.P.'s waiver was voluntary, we affirm.

FACTS

When M.P. and her friend and neighbor, C.L., were 11 or 12 years old, M.P. took videos of C.L. naked while showering and getting dressed. C.L. asked M.P.

_____

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Citations and pin cites are based on the Westlaw online version of the cited material.

to stop filming her and to delete the videos. The girls later had a falling out over an unrelated event and stopped spending time together.

On November 3, 2017, when M.P. was 13, C.L. learned that the videos she thought M.P. had deleted were posted to M.P.'s Snapchat[2] account. C.L. asked M.P. to delete the posts. M.P. denied posting the videos, stating that she no longer had a phone. C.L. offered to let M.P. use her device to log into M.P.'s account, but M.P. told her that the Snapchat account had been hacked. Later that evening, C.L.'s stepfather, Soma Vailolo, spoke to M.P.'s mother, Tiffany Thompson, to demand that M.P. remove the videos. Thompson told Soma[3] M.P. did not have a device from which to post videos.

Within 30 minutes of Soma confronting Thompson, C.L.'s friends told her more images of her appeared on M.P.'s Snapchat account. Then a Snapchat group chat ensued between C.L., A.D., M.P., and another user. A.D., C.L.'s friend, believed it was wrong to post the videos of C.L., and she testified that she argued with M.P. about posting the videos. According to A.D., she first saw the videos when M.P. reposted them in the group chat.

That same evening, C.L.'s mother, Siobhan Vailolo, contacted the police about the incident. The responding officer copied the videos, collected screen shots of the group chat conversation, and photographed C.L.'s bathroom, shower, and bedroom.

---

[2] Snapchat is a cell phone app similar to text messaging except that photos and texts sent through Snapchat disappear once they are seen by the recipient—unless, as in this case, the recipient saves the text and images. See Nelson v. Duvall, 197 Wn. App. 441, 445 n.1, 387 P.3d 1158 (2017).

[3] Where necessary, we use first names to differentiate persons sharing surnames. No disrespect is intended.

On January 23, 2018, Federal Way detectives interviewed M.P. in an interview room adjacent to the police station lobby. Detective Adams explained to M.P. and her mother that he wanted to interview M.P. first and then Thompson. Detectives Adams and Coffey recorded the interview that took place behind closed doors, with Thompson waiting just outside in the lobby. After briefly asking M.P. her name, address, birth date, phone number, and how long she had known C.L., Detective Adams read the Miranda warnings[4] to M.P. from a preprinted form. M.P. stated she understood the warning and agreed to speak with the detectives.

During the interview, M.P. admitted the account used to post the videos to Snapchat was hers, but she consistently denied taking the videos of C.L. or posting the videos to her Snapchat account. Instead, she maintained that her account had been hacked and someone else must have posted the videos. She also insisted, in the face of Detective Adams' repeated questions, that she no longer had a cell phone because her mother had thrown it out the car window a year before.

The State accused M.P. of disclosing intimate images of a minor in violation of RCW 9A.86.010.[5] At trial, the State offered statements M.P. made to Detectives Adams and Coffey following the waiver of her Miranda rights. The court postponed argument on whether to admit M.P.'s statements under CrR 3.5 until the end of trial.

---

[4] Because M.P. is a juvenile, these warnings included the following language, "If you are under the age of 18, anything you say can be used against you in a juvenile court prosecution for a juvenile offense, and can also be used against you in an adult court criminal prosecution if you are to be tried as an adult."

[5] A person under the age of 18 is guilty of the crime of disclosing intimate images if the person: "(a) [i]ntentionally and maliciously disclosed an intimate image of another person; (b) [o]btained it under circumstances in which a reasonable person would know or understand that the image was to remain private; and(c) [k]nows or should have known that the depicted person has not consented to the disclosure." RCW 9A.86.010(2).

Detective Adams testified that the interview with M.P. started out "low-key." He was just talking to her, and then when he realized they were getting into the substantive part of the interview, he paused the interview to read M.P. her Miranda warnings. According to Detective Adams, M.P. was responsive and engaged in the interview and spoke up when she did not understand something.

C.L., Siobhan, and Soma testified to the events of November 3, 2017, as stated above. C.L. further testified she could hear M.P.'s voice in the videos. M.P.'s mother testified M.P. could not have posted the videos online because she did not have a phone and because M.P.'s Snapchat account had been hacked.

The trial court concluded M.P.'s statements were admissible. In concluding that M.P. voluntarily made statements to the detectives after receiving her Miranda warning, the trial court found M.P. "to be a bright, strong, and engaged conversationalist . . . . [, a]nd my observations over a couple-day trial confirm that as well." It also found that M.P. was not induced by threats or promises, and that the "normal conversational tone and pace" of the interview did not overbear M.P.'s will. "At no point did [it] find the kind of threats, coercion, overwhelming the will that [it's] supposed to be on the lookout for [or that] would lead [it] to exclude any statements in . . . the interview."

The trial court subsequently found M.P. guilty of disclosing intimate images. It concluded that M.P. had intentionally and maliciously disclosed intimate images of C.L. without her consent and that M.P. had obtained those images under circumstances in which a reasonable person would know or understand that the images were to remain private.

M.P. appeals.

ANALYSIS

M.P. argues the trial court erred by admitting the statements she made to the detectives, contending that her <u>Miranda</u> waiver was not knowing, intelligent, and voluntary. She asks this court to require a heightened <u>Miranda</u> standard for juveniles under the age of 14. Citing a number of out-of-state cases and studies, she contends that juveniles under 14 must have counsel or a parent present before a waiver of their <u>Miranda</u> rights can be deemed valid. The Washington Supreme Court rejected this argument in <u>Dutil v. State</u>, 93 Wn.2d 84, 606 P.2d 269 (1980), precedent we are bound to follow.

To safeguard a person's Fifth Amendment right against self-incrimination, before any custodial interrogation, the police must advise the person of (1) the right to remain silent, while giving notice that anything said to the police might be used against her; (2) the right to consult with an attorney prior to answering any questions and have the attorney present for questioning; (3) the right to counsel, including the appointment of counsel if she cannot afford to hire one; and (4) the right to end questioning at any time. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). This constitutional privilege against self-incrimination under <u>Miranda</u> applies with equal force to juveniles. <u>In re Gault</u>, 387 U.S. 1, 55, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). Our legislature adopted this standard, providing that children under 12 years of age must have a parent or guardian present to waive their <u>Miranda</u> rights. RCW 13.40.140(8) ("A juvenile shall be accorded the same privilege against self-incrimination as an adult."); .140(10)-(11) (juveniles over 12 may expressly and intelligently waive their right against self-incrimination after receiving <u>Miranda</u> warnings).

Forty years ago, our Supreme Court acknowledged that, by passing a statute allowing only a parent or guardian to waive the legal rights of children under the age of 12, the legislature had determined that those very young children needed additional parental and legal assistance. Dutil, 93 Wn.2d at 94; see also RCW 13.40.140(10)-(11). But it rejected the argument that juveniles, regardless of age, had a constitutional right to similar protections. Dutil, 93 Wn.2d at 90.

In rejecting the per se rule M.P. advocates here, the court expressly adopted the United States Supreme Court's "totality of the circumstances" approach in juvenile interrogation:

> Under the totality of circumstances approach, the determination of whether a knowing and intelligent waiver has been made is the responsibility of the juvenile judge, who is presumably experienced in handling juvenile cases and who has the child and other witnesses before him, as well as the facts pertaining to the child's age, intelligence, education[,] and experience. The circumstances in no two cases are the same. The presence of a parent or guardian in one case may be an inhibiting or coercive factor, where in another his presence may indeed be significant in helping the juvenile to decide whether to waive his rights. The petitioners would have us create a dogmatic rule, cloaking it in constitutional armor, and decreeing in advance that the presence of a parent or surrogate is essential to an intelligent waiver, without regard to the facts of the particular case.

Id. at 89; see also Fare v. Michael C., 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979) ("We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived h[er] rights, as opposed to whether an adult has done so. The totality approach permits indeed, it mandates inquiry into all the circumstances surrounding the interrogation.").

Accordingly, we apply the totality of the circumstances test to determine whether M.P. knowingly, intelligently, and voluntarily waived her right against self-

incrimination. M.P. concedes Detective Adams read her the Miranda warnings from a preprinted form. She challenges, however, the trial court's finding that her interview was "conversational and carried a normal tone and pace. There were no threats or promises made by the [d]etectives, nor any conduct that would overbear [M.P.'s] will and coerce a confession." She also challenges the finding that her statements during the interview were made knowingly, voluntarily, and intelligently.

Challenged findings entered after a CrR 3.5 motion to suppress hearing that are supported by substantial evidence are binding, and we accept unchallenged findings as true on appeal. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). If the findings are supported by substantial evidence, we review de novo whether the findings of fact support the conclusions of law. State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999), abrogated on other grounds by Brendlin v. California, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007); see also State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

Circumstances surrounding the interrogation that are potentially relevant in the totality of the circumstances analysis include the "crucial element of police coercion;" the length of the interrogation; its location; its continuity; the defendant's maturity, intelligence, education, and experience; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation. State v. Unga, 165 Wn.2d 95, 101, 196 P.3d 645 (2008) (quoting Withrow v. Williams, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)).

The inherently coercive nature of police interrogation, J.D.B. v. North Carolina, 564 U.S. 261, 268-69, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011), requires the State to prove the voluntariness of M.P.'s waiver by a preponderance of the evidence, State v. Braun, 82 Wn.2d 157, 162, 509 P.2d 742 (1973). In determining voluntariness, the question is whether the interrogating officer's statements were so manipulative or coercive that they deprived M.P. of her ability to make an unconstrained, autonomous decision. Unga, 165 Wn.2d at 102 (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986)). We will deem M.P.'s waiver voluntary if we conclude it was the product of her own free will and judgment. Id.

Based on this record, there is substantial evidence supporting the challenged findings, and the findings support the conclusion that M.P.'s waiver was voluntary. This court's review of the audio interrogation indicates that neither detective raised his voice during the interview, nor did they speak too quickly or too slowly. Detective Adams gave M.P. ample time at the end of each question to respond. When read her Miranda rights, M.P. promptly and clearly responded, "Yes," that she understood her rights, and "Yes," that she wished to speak to the detectives.

Furthermore, neither detective threatened M.P. or promised her anything, nor did they engage in any conduct that would overbear her will or coerce a confession. As the trial court found, M.P. "consistently denied the allegations that she had taken the videos in question and denied that she had disseminated them in any way." M.P. never faltered in her denial of taking the videos or posting them to Snapchat. Even when Detective Adams related the proverbial hand-caught-in-

the-cookie-jar allegory, M.P. demonstrated that she understood the import of the story when she quickly responded that lying was bad. And yet, she persisted, through tears, that she did not take the videos of C.L. or post them to her Snapchat account.

Given the totality of the circumstances of M.P.'s 30-minute interview with detectives—when she was 13 years old and her mother waited in the lobby—M.P. intelligently and cogently responded to the detectives' questions. When she did not understand something, she asked for clarification. When Detective Adams asked M.P. how it was possible for someone other than her to repost the videos to Snapchat so soon after C.L. confronted her about them, M.P. asked him to explain what he meant. When he stated he wanted her to learn from this minor situation and not have any ongoing problems, M.P. indicated she understood. But when he went on to discuss sex offender registration, she admitted knowing what a sex offender was but not knowing that such persons had to register their status as a sex offender with local law enforcement. M.P. also admitted that she did not know the difference between a felony and a misdemeanor, and her responses during Detective Adams' explanation showed that she was following the discussion.

The trial court found that during the 30-minute interview, M.P.'s interactions "included appropriate answers to questions, asking for clarification when she did not understand certain topics, and both agreement and disagreement with various questions." Based on this record, we conclude the trial court's findings are supported by substantial evidence, and those findings support its conclusion that M.P. waived her Miranda rights explicitly and made all subsequent statements

knowingly, intelligently, and voluntarily. Therefore, the trial court did not err by admitting the statements M.P. made to Detectives Adams and Coffey.

Even assuming error, admitting statements in violation of Miranda is harmless if we are convinced beyond a reasonable doubt that a reasonable trier of fact would have reached the same result without the error. State v. Mayer, 184 Wn.2d 548, 566, 362 P.3d 745 (2015). "[I]f trial error is of constitutional magnitude, prejudice is presumed[,] and the State bears the burden of proving it was harmless beyond a reasonable doubt." State v. Coristine, 177 Wn.2d 370, 380, 300 P.3d 400 (2013). If the untainted evidence is so overwhelming that it necessarily leads to the same outcome, an error is harmless beyond a reasonable doubt. Mayer, 184 Wn.2d at 566.

M.P. primarily contends that admitting her statements was not harmless error because the credibility of those statements formed the basis for the trial court's findings against her. But M.P.'s statements were no different than the testimony of her mother, Thompson, whom the trial court also deemed not to be credible. "Credibility determinations are for the trier of fact and are not subject to review." State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). As a result, we must accept the trial court's finding that C.L., her mother, and her stepfather were credible while Thompson was not. Even if the trial court disregarded what M.P. told Detectives Adams and Coffey, the trial court would have still rejected Thompson's story that M.P. had no method of accessing Snapchat, particularly in light of the captured group chat conversation in which M.P. participated immediately after C.L.'s stepfather confronted Thompson about the videos.

Even without M.P.'s custodial statements, the evidence overwhelmingly supports the conclusion that M.P.—and not some unknown hacker—posted the images of C.L. to Snapchat. C.L. testified that she saw M.P. take the videos and that she recognized M.P.'s voice on the videos. C.L. told M.P. to stop recording, asked M.P. to delete the videos, and assumed that they were deleted. M.P.'s Snapchat account, which she controlled at some point, was used to post the images for other Snapchat users to view. Shortly after C.L. confronted M.P. about the posts and asked her to take them down, the videos were posted again. Then, in a group chat with M.P., C.L., A.D., and another user, M.P. acknowledged C.L.'s presence in the chat, posted the videos again, and the two girls exchanged comments about each other—evidencing the animosity between the two since their friendship fell apart a year before. We conclude that even without M.P.'s post-Miranda statements, there was proof beyond a reasonable doubt that M.P. disclosed the intimate images of C.L. Therefore, any possible error in admitting M.P.'s statements was harmless.

Affirmed.

_Andrus, A.C.J._

WE CONCUR:

_Brennan, J_          _Dwyer, J._

- 11 -