# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59148-1-II |
| Respondent, | |
| v. | |
| HINA SADIA, | UNPUBLISHED OPINION |
| Petitioner. | |

LEE, J. — Hina Sadia appeals the no contact order (NCO) imposed at sentencing, arguing that the lifetime NCO prohibiting contact between her and her son violates her constitutional right to parent. The State concedes that the trial court failed to consider Sadia's constitutional right to parent her son and any less restrictive alternatives to a lifetime NCO, and asks this court to remand with instructions to consider the requisite factors on the record. In a statement of additional grounds for review (SAG),[1] Sadia argues that the trial court erred by denying her motion to suppress statements made to law enforcement and her motion to replace an allegedly biased juror. Sadia also claims that one of the law enforcement officers was not credible because he contradicted his sworn testimony at trial with statements he made at sentencing.

Because the trial court imposed a lifetime NCO without an on the record consideration of Sadia's right to parent, the necessity of the NCO, or less restrictive alternatives, we accept the

---

[1] RAP 10.10.

parties' agreement that the trial court erred. But we reject Sadia's SAG claims. Thus, we affirm Sadia's convictions, strike the NCO, and remand to the trial court with instructions to consider, on the record, whether to impose a NCO, taking into consideration Sadia's constitutional right to parent, the necessity of a lifetime NCO, and any viable, less restrictive alternatives that may exist.

FACTS

A. UNDERLYING FACTS

On May 17, 2020, Sadia strangled her young daughter to death and attempted to kill her young son, Ab.S.[2] At trial, Sadia testified that she attacked her children because she heard a voice telling her to kill them; the voice suggested that the only way for Sadia to protect her children was to kill them. Sadia explained that she began strangling Ab.S. first, but then the voice told her that because her daughter was a girl, she would face more danger than Ab.S. It was then that Sadia stopped strangling Ab.S. and strangled her daughter until her daughter stopped moving. At that point, Sadia tried to wake her daughter, and when her daughter did not respond, Sadia ran downstairs and called 911. Sadia thought that when the police arrived, they would execute her.

Sadia answered the door when police arrived, and they immediately detained her. While Sadia was detained, police searched the home. In an upstairs bathroom, police found Sadia's daughter lying unresponsive in the bathtub, and Ab.S. sitting and crying next to his sister. One officer attended to Ab.S., while others took the girl downstairs to try and resuscitate her. Both

---

[2] We use initials to protect the victim's identity and privacy interests. *See* Gen. Order 2023-2 of Div. II, *Using Victim Initials* (Wash. Ct. App.), available at: https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2023-2&div=II.

children were eventually transported to the hospital, and Sadia was taken to the police station for an interview. During the interview, Sadia admitted to strangling her children.

B.    CHARGES AND NOT GUILTY BY REASON OF INSANITY PLEA

On May 18, the State charged Sadia with two counts of attempted first degree murder. However, on May 22, Sadia's daughter died as a result of being strangled. The State subsequently filed an amended information charging Sadia with one count of first degree murder and one count of attempted first degree murder. Both crimes were charged as crimes of domestic violence and carried the following aggravators: use of a position of trust, particularly vulnerable victims, and multiple victims. Sadia pleaded not guilty by reason of insanity to the charges.

C.    TRIAL

Three experts testified at trial regarding whether Sadia was legally insane when she committed her crimes. First, Dr. Diana Barnes, a psychotherapist and perinatal mental health specialist testified that, at the time of the crimes, Sadia was suffering from "bipolar disorder, most recent episode manic, with psychotic symptoms with peripartum onset." 15 Verbatim Rep. of Proc. (VRP) (Apr. 24, 2023) at 1643. Dr. Barnes opined that, as a result, Sadia could neither perceive the nature and quality of the acts with which she was charged nor could she distinguish right from wrong.

Next, Dr. Megan Kopkin, a licensed psychologist and forensic evaluator testified that at the time of the offenses, Sadia suffered from "major depressive disorder with psychotic features." 16 VRP (Apr. 25, 2023) at 1872. Dr. Kopkin opined that Sadia's depression did not render her unable to "perceive the nature and quality of [her] act[s]," but that it did render her "unable to tell right from wrong at the time of the offenses." 16 VRP (Apr. 25, 2023) at 1946, 1948.

Finally, Dr. Brian Judd, a licensed psychologist, testified that even if he assumed Sadia had either of the mental diseases or defects that Drs. Barnes and Kopkin diagnosed, he would still conclude that Sadia was able to perceive the nature and quality of the acts with which she was charged. Thus, Dr. Judd opined that even assuming a mental disease or defect, Sadia was able to know right from wrong when she committed her crimes.

The jury rejected Sadia's insanity defense and found Sadia guilty as charged.

D.    SENTENCING

The trial court sentenced Sadia to 320 months of confinement on count 1 (first degree murder), 240 months of confinement on count 2 (attempted first degree murder), and ordered the sentences be served consecutively, resulting in a sentence of 560 months of total confinement.

The State recommended that Sadia be prohibited from contacting Ab.S. Without any discussion, the trial court granted the State's request. The court's written NCO prohibits Sadia from contacting Ab.S. for life. The court's NCO also states Sadia and Ab.S. are "parents of a child-in-common." Suppl. Clerk's Papers (CP) at 215.

Sadia appeals.

ANALYSIS

A.    LIFETIME NO-CONTACT ORDER

Sadia argues that because the lifetime NCO implicates her constitutional right to parent and associate with her child, the trial court erred by imposing the lifetime NCO without an on the record consideration of the appropriate length and scope of the NCO. The State concedes that the trial court erred and joins Sadia in asking that we remand to the trial court with instructions to consider Sadia's constitutional right to parent and other requisite factors before imposing whatever

NCO the trial court deems appropriate. We accept the State's concession, strike the NCO, and remand to the trial court with instructions that it consider the requisite factors regarding imposition of a NCO between parent and child.

  1.  Legal Principles

  Pursuant to the Sentencing Reform Act of 1981 (SRA), courts may impose crime-related prohibitions as part of a criminal sentence. RCW 9.94A.505(9). However, when a condition interferes with fundamental rights, such as the right to parent, the condition must be sensitively imposed and reasonably necessary to accomplish the essential needs of the State and public order. *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 377, 229 P.3d 686 (2010). We review crime-related sentencing conditions for an abuse of discretion, even where, as here, they affect a constitutional right. *Id.* at 374-75.

  Preventing harm to a child is a compelling state interest, and the State has an obligation to intervene and protect a child when a parent's actions or decisions seriously conflict with the child's physical or mental health. *State v. DeLeon*, 11 Wn. App. 2d 837, 841, 456 P.3d 405 (2020); *see also Rainey*, 168 Wn.2d at 377 (explaining that the State has a compelling interest in protecting the defendant's child). As for whether the condition at issue is "reasonably necessary," our Supreme Court has recognized that the inquiry "is delicate and fact-specific, not lending itself to broad statements and bright line rules." *Rainey*, 168 Wn.2d at 377.

  A sentencing condition that interferes with a fundamental right must be "narrowly drawn," and "[t]here must be no reasonable alternative way to achieve the State's interest." *State v. Warren*, 165 Wn.2d 17, 34-35, 195 P.3d 940 (2008), *cert. denied*, 556 U.S. 1192 (2009). Before the trial court can prohibit a defendant from ever contacting their children, it must (1) address the

5

defendant's constitutional right to parent; (2) explain why the NCO is reasonably necessary to achieve the State's interest in protecting the defendant's children; and (3) analyze whether less restrictive alternatives exist. *DeLeon*, 11 Wn. App. 2d at 841-42; *accord State v. Reedy*, 26 Wn. App. 2d 379, 392, 527 P.3d 156, *review denied*, 1 Wn.3d 1029 (2023). And the trial court must do so on the record. *DeLeon*, 11 Wn. App. 2d at 841-42; *Rainey*, 168 Wn.2d at 382.

2.      Trial Court Erred

Here, the trial court summarily imposed a lifetime NCO prohibiting contact between Sadia and Ab.S. without conducting any of the aforementioned analysis on the record. While the record suggests the State has a clear interest in protecting Ab.S. from further harm, the trial court did not explain why a lifetime NCO was reasonably necessary to achieve the State's interest. *See* 16 VRP (Apr. 25, 2023) at 1952-53, 1962 (Dr. Kopkin acknowledges that Sadia posed a low risk of reoffending), *and* 17 VRP (Apr. 26, 2023) at 2054-55, 2123 (Dr. Kopkin clarifies that medication would further minimize Sadia's risk of reoffending). Nor did the trial court consider Sadia's constitutional right to parent or whether there were less restrictive, viable alternatives to a lifetime NCO. This was error. *See DeLeon*, 11 Wn. App. 2d at 842 ("[T]rial courts must conduct the above analysis on the record.").

The appellate courts of this state have viewed "indeterminate or lengthy" NCOs with skepticism, especially where, as here, the case does not involve child sexual abuse. *See Reedy*, 26 Wn. App. 2d at 392-93 (collecting cases). Also, considering the role mental illness played in Sadia's crimes, her improvement while incarcerated, and the fact that Ab.S. has yet to reach the

6

age of majority,[3] it may well be that a less restrictive, viable alternative to a lifetime NCO is reasonable. *See* 22 VRP (July 28, 2023) at 2568 (trial court acknowledged that "mental illness played a significant role in the commission of these crimes"); 15 VRP (Apr. 24, 2023) at 1667 (Dr. Barnes testified that Sadia's jail records indicate "she was receiving some antidepressant treatment [and] she started to feel better"); 16 VRP (Apr. 25, 2023) at 1944 (Dr. Kopkin noted Sadia's prescription for antidepressants while in custody and subsequent improvement of depressive symptoms); 18 VRP (May 1, 2023) at 2252 (Dr. Judd acknowledged that jail records "noted improvement in [Sadia's] depressive symptoms" after she was prescribed antidepressant medication). Alternatively, it may also be "that such [an] alternative[] do[es] not exist." *DeLeon*, 11 Wn. App. 2d at 841. But we do not know because the trial court did not consider, on the record, any possible alternatives nor any of the other requisite factors enumerated above. Thus, the trial court abused its discretion.

We strike the NCO and remand to the trial court with instructions to consider a NCO on the record, addressing Sadia's constitutional right to parent, explaining why the NCO is reasonably necessary to achieve the State's interest in protecting Ab.S., and analyzing whether less restrictive alternatives exist.[4]

---

[3] Because Ab.S. has not yet reached the age of majority, he has an interest "in having the affection and care of his parents." *Moore v. Burdman*, 84 Wn.2d 408, 411, 526 P.2d 893 (1974).

[4] Sadia also argues, and the State concedes, that the NCO contains a clerical error because it states that Sadia and Ab.S. are "parents of a child-in-common" when they are actually mother and son. Suppl. CP at 215. Because we are striking the NCO and remanding to the trial court, we do not address the clerical error here. However, on remand the trial court should ensure that the NCO accurately reflects Sadia and Ab.S's relationship to one another.

B.    STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

Sadia filed a SAG with three additional claims for review. We reject all three of Sadia's claims.

1.    CrR 3.5 Hearing

Sadia claims that the trial court erred by denying her motion to suppress statements she made during her police interview because she did not understand her *Miranda*[5] rights and thus did not voluntarily, knowingly, and intelligently waive them. We disagree.

a.    Additional facts

i.    CrR 3.5 hearing

Prior to trial, Sadia moved pursuant to CrR 3.5 to suppress statements she made to law enforcement following her arrest. Several witnesses testified at the CrR3.5 hearing.

First, retired Officer Robert Eugley testified that he responded to the scene on May 17, 2020. Sadia opened the door when he knocked, and he immediately detained her. While being detained, Sadia spontaneously told Eugley in English: "'I'm a bad mother. I did it with my hands.'" 6 VRP (Mar. 28, 2023) at 525. Eugley stopped Sadia and began reading the *Miranda* warning to her. Sadia informed Eugley that she spoke little English, at which point Eugley stopped speaking with Sadia. Eugley subsequently transported Sadia to the police station for an interview.

Detective Jeff Rackley testified next. Detective Rackley interviewed Sadia with Detective Paul Johnson. Because Detective Rackley knew Sadia's first language was Urdu, he called the

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

"Language Line" and contacted an Urdu interpreter to translate telephonically.  6 VRP (Mar. 28, 2023) at 539.

A transcript and video recording of the interview, both of which were admitted into evidence for purposes of the CrR 3.5 hearing, reveal what occurred next.

> [Detective Rackley]:  Okay.  Right now, you have the right to remain silent.
> Can you please tell her that?
> Interpreter speaking.
> [Detective Rackley]:  She looks quizzical like she didn't understand.  I'll repeat it, if you could—
> [Sadia]:  No (inaudible) I understand you.
> [Detective Rackley]:  Okay.  But I need her, do you understand what she said?
> [Sadia]:  She said another thing, but (inaudible), I understand.

Ex. 2 at 6; Ex. 1, VTS_01_1.VOB at 11:23-12:08.  The interpreter then stated they were having trouble hearing, so Detective Rackley moved the phone closer to himself and Sadia, and the interpreter said it was "better."  Ex. 2 at 6; Ex. 1, VTS_01_1.VOB at 12:08-28.  Detective Rackley asked the interpreter to tell Sadia "that she has the right to remain silent," the interpreter spoke, and Sadia responded, "Okay."  Ex. 2 at 6; Ex. 1, VTS_01_1.VOB at 12:28-42.

Detective Rackley then advised Sadia of her right to an attorney, and Sadia waived her rights.

> [Detective Rackley]:  Uh, she has the right at this time to an attorney.
> Interpreter speaking:  Okay.  She has the right at this time to do what?
> [Detective Rackley]:  To an attorney.
> Interpreter speaking.
> [Sadia]: Okay.
> [Detective Rackley]:  Anything she says, can and will be used against her in a court of law.
> Interpreter speaking.
> [Sadia]:  Okay.
> [Detective Rackley]:  She has the right to talk to an attorney before answering any questions.

Interpreter speaking.

[Sadia]: Okay.

[Detective Rackley]: She has the right to have an attorney present during the questioning.

Interpreter speaking: (Inaudible) say?

[Detective Rackley]: I'll, I'll repeat it again. She has the right to have an attorney present during the questioning.

Interpreter speaking.

[Sadia]: Okay.

Interpreter speaking: Okay.

[Detective Rackley]: Okay. If she cannot afford an attorney, one will be appointed for her without cost, if she wants.

Interpreter speaking.

[Sadia]: Okay.

[Detective Rackley]: Alright

Interpreter speaking: Okay.

[Detective Rackley]: Okay. And the last one, she can des—she can exercise these rights at any time.

Interpreter speaking.

[Sadia]: Okay.

Interpreter speaking: Okay.

[Detective Rackley]: Okay. Um, can you ask her, "Do you understand your rights?"

Interpreter speaking.

[Sadia]: (Inaudible) Yeah.

[Detective Rackley]: Okay.

Interpreter speaking: Yes.

[Detective Rackley]: Alright. And with these rights in mind, does she want to speak with us?

[Interpreter and Sadia speak in Urdu.]

[Sadia]: . . . Yeah.

Interpreter speaking: Yes.

[Detective Rackley]: Okay. Um, then if she's willing to waive her rights, I will read the waiver to you. It's two lines long. Let me know if you want me to read it again. I understand my Constitutional Rights. I have decided not to exercise these rights at this time. Any statements made by me, are made freely, voluntarily and without threats or promises of any kind.

Interpreter speaking.

[Sadia]: (Replies).

Interpreter speaking.

[Sadia]: (Replies).

Interpreter speaking:  Yes, I understand.  [M]y rights.[6]
[Detective Rackley]:  Okay.  If she would still like to speak with us, I have a paper with the printed rights on it, if she'll sign her name where I'm indicating.
Interpreter speaking.
[Sadia]:  (Replies).
Interpreter speaking:  Could you please repeat?  What did you say?
[Detective Rackley]:  Sure.  Did you, did you take down what I said?  I'll read it again for you, interpreter.  It says, I understand my Constitutional Rights.  I have decided not to exercise these rights at this time.  Any statements made by me, are made freely, voluntarily and without threats or promises of any kind.
Interpreter speaking.
[Sadia]:  Okay.

Ex. 2 at 6-9; Ex. 1, VTS_01_1.VOB at 12:41-17:25.  Sadia was then presented with a waiver form, which she signed.

A certified Urdu court interpreter, Nadira Khan, also testified.  Khan testified that she reviewed the interview recording and transcript, and identified places where the telephone interpreter may have mistranslated what Detective Rackley said.  When Detective Rackley told Sadia she had the right to remain silent, the interpreter told Sadia that they were in a police station and were being audio and video recorded.  Khan also pointed out that when the interpreter translated that Sadia had the right to an attorney, the interpreter used the English word "attorney" rather than an Urdu word, and that the interpreter said "your attorney" rather than "an attorney." 8 VRP (Mar. 30, 2023) at 813, 817.

Khan also testified that when the interpreter asked Sadia whether she would still speak with the police despite her rights, the interpreter did not include the phrase "'[w]ith these rights in mind.'"  8 VRP (Mar. 30, 2023) at 821.  In addition, the interpreter did not include the phrase

---

[6] The interpreter's translation of Sadia's response is transcribed as "Yes, I understand.  [M]y rights."  Ex. 2 at 8.  However, in the recording, it appears the interpreter responds "Yes, I understood."  Ex. 1, VTS_01_1.VOB at 16:07-09.

"'without threats or promises'" when interpreting the waiver language. 8 VRP (Mar. 30, 2023) at 822.

ii.    Motion to suppress denied

Following the CrR 3.5 hearing, the trial court denied Sadia's motion to suppress and entered written findings of fact and conclusions of law. The trial court's findings state that there were no disputed facts; rather, the parties disputed the inferences that could be drawn from the undisputed facts.

The trial court concluded that Sadia "sufficiently understood each of her *Miranda* rights and agreed to answer questions freely, knowingly and voluntarily." CP at 97. The trial court also concluded that the State had proven, by a preponderance of the evidence, that Sadia "made an intelligent, knowing and voluntary waiver" of her *Miranda* rights. CP at 97. Finally, the trial court concluded that all of the statements Sadia made to police after her arrest were admissible.

b.    Trial court did not err

Before being questioned by law enforcement, both our state and the federal constitutions require that a defendant

> "be warned that [they have] a right to remain silent, that any statement [they] do[] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."

*State v. Templeton*, 148 Wn.2d 193, 207-08, 59 P.3d 632 (2002) (quoting *Miranda*, 384 U.S. at 444).

The State bears the burden of proving, by a preponderance of the evidence, that the defendant knowingly, voluntarily, and intelligently waived their *Miranda* rights. *State v. Athan*,

160 Wn.2d 354, 380, 158 P.3d 27 (2007). Whether a waiver of *Miranda* rights is knowingly, voluntarily, and intelligently made depends on the totality of the circumstances, and we can infer waiver where the defendant is informed of their *Miranda* rights, understands them, and volunteers information without duress, promises, or threats. *State v. Mayer*, 184 Wn.2d 548, 556, 362 P.3d 745 (2015); *State v. Terrovona*, 105 Wn.2d 632, 646-47, 716 P.2d 295 (1986).

A language barrier does not automatically invalidate a defendant's waiver:

> Although a suspect's ability to make a knowing and intelligent waiver of [their] *Miranda* rights may be inhibited by language barriers, a valid waiver may be effected when a defendant is advised of [their] *Miranda* rights in [their] native tongue and claims to understand such rights. Further, the translation of *Miranda* from English to [the defendant's native language] need not be perfect—it is sufficient that the defendant "understands that [they] do[] not need to speak to police and that any statement [they] make[] may be used against [them]."

*State v. Teran*, 71 Wn. App. 668, 672-73, 862 P.2d 137 (1993) (quoting *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990), *cert. denied*, 499 U.S. 908 (1991)), *review denied*, 123 Wn.2d 1021 (1994), *abrogated on other grounds by State v. Hill*, 123 Wn.2d 641, 644–45, 870 P.2d 313 (1994).

We review a trial court's CrR 3.5 findings of fact for substantial evidence. *State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 755, 294 P.3d 857, *review denied*, 178 Wn.2d 1019 (2013). We review de novo whether the trial court's conclusions of law flow from the findings of fact. *Id*.

In her SAG, Sadia disagrees with the trial court's conclusion that: (1) she understood her *Miranda* rights despite the language barrier and some mistranslations; (2) she freely, knowingly, and voluntarily waived her *Miranda* rights; and (3) she was not so "affected by her mental disorder

13

while in police custody" that she could not understand her rights.[7] CP at 97. But the trial court's findings of fact support these conclusions.

For example, the trial court found that even though the interpreter did not initially translate Sadia's right to remain silent, the record shows that Sadia stopped Detective Rackley from repeating the warning to tell him that she understood Detective Rackley, and she even informed Detective Rackley that the interpreter had "said another thing," further demonstrating her understanding of both the English language and her right to remain silent. Ex. 2 at 6; CP at 89. The trial court also found that Sadia told one of the doctors that evaluated her mental state that when she was asked if she needed an attorney, she asked, "'Why do I need an attorney? Just kill me,'" supporting the trial court's conclusion that she understood her right to an attorney.[8] 3 VRP (Mar. 22, 2023) at 388; CP at 91.

Nor did the interpreter's failure to include certain phrases in their translations—i.e., "with these rights in mind" and "without threats or promises"—prevent Sadia from understanding her rights or the consequences of waiving them, as the trial court concluded. Law enforcement does not need to use "the precise language stated in *Miranda*" to adequately advise a defendant of their

---

[7] We note that Sadia's spontaneous admission that "'I'm a bad mother. I did it with my hands,'" made to Eugley as she was being detained, was not in response to any questioning or statements likely to elicit an incriminating response. 6 VRP (Mar. 28, 2023) at 525. The same is true of Sadia's statement, made after she was placed in a patrol car, that "'Oh, she is still alive.'" 6 VRP (Mar. 28, 2023) at 528. "Statements which are freely given are voluntary and if they are likewise spontaneous, unsolicited, and not the product of custodial interrogation, they are not coerced within the concept of *Miranda*." *State v. Miner*, 22 Wn. App. 480, 483, 591 P.2d 812, *review denied*, 92 Wn.2d 1011 (1979).

[8] During the CrR 3.5 hearing, the parties agreed that the trial court could consider evidence presented at the hearing on Sadia's motion for acquittal by reason of insanity for purposes of the motion to suppress.

rights. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 434, 114 P.3d 607 (2005), *abrogated on other grounds by Cary v. Musladin*, 549 U.S. 70 (2006). Here, the trial court found that Sadia had just been read her rights in English and in Urdu when she was asked whether she wanted to speak with the police, so she certainly had her rights in mind when she answered affirmatively. Furthermore, as the trial court found, Sadia was still informed, in English and in Urdu, that any statements she made should be made "freely" and "voluntarily." Ex. 2 at 9; CP at 92.

Finally, the trial court found that "[e]ven if [Sadia] was affected by her mental disorder while in police custody, [Sadia] was able to and had the capacity to understand the questions asked and [was] able to respond in a clear and cogent manner. At all times, [Sadia] was responsive to the questions asked." CP at 97. Indeed, Sadia was able to answer Detective Rackley's questions, and several of her responses evince an understanding of not only Urdu, but English as well. And Sadia's later statements to one of the evaluating doctors demonstrate that she understood her rights. Thus, the trial court's findings support the trial court's conclusion that Sadia knowingly, voluntarily, and intelligently waived her *Miranda* rights. Accordingly, Sadia's claim fails.

2.      Motion to Excuse Juror

Sadia claims that her right to a fair trial was violated by the seating of a biased juror. We disagree.

a.       Additional facts

Following the completion of voir dire, jury administration alerted the trial court that it had been alerted by an excused potential juror (reporting juror)[9] that they heard juror 2[10] "make remarks about their distrust with big pharm and also . . . some xenophobic remarks."  12 VRP (Apr. 6, 2023) at 1325.

The trial court, with both parties present, contacted the reporting juror by phone.  The reporting juror stated that during a direct conversation with juror 2, juror 2 expressed "a lot of conspiratorial thinking, very QAnonish-type narratives around the jab."  12 VRP (Apr. 6, 2023) at 1341.  The reporting juror also claimed they overheard juror 2 conversing with another juror.  The reporting juror recounted what they overheard as follows:

> And they were talking about immigration policies, and that, you know, basically more along that QAnon, very Trumpy dialogue about—and so I think that because the defendant is an immigrant and the distrust in the pharmaceutical and medical system, I don't think that [Sadia] would receive a fair trial with this.  And yeah, this person is obviously—I think there were some xenophobic leaning when you talk about people, immigrants and taking on immigrants and that process, like that right there says you can't be fair and impartial no matter how much you try because if it's in your heart that deeply that you are speaking about it to a group like, no, no, not okay.

12 VRP (Apr. 6, 2023) at 1342.

The trial court asked the reporting juror if they remembered the exact words juror 2 used and the reporting party responded, "[L]ike basically that immigrants were being allowed into this

---

[9]  The reporting juror is referred to in the record as "JUROR 60," but for clarity, we refer to them as the reporting juror.  12 VRP (Apr. 6, 2023) at 1340.

[10]  Before being seated, juror 2 was prospective juror 6, and is referred to as such in the record. However, for clarity, we refer to this juror as juror 2.

country, and it was part of a whole like conspiratorial thinking, along the lines of, you know, the QAnonish, like Fox News type narrative." 12 VRP (Apr. 6, 2023) at 1343. When asked to further clarify, the reporting juror stated, "I'm trying to give you the best words. . . . I have an interpretation of what was said and then what was actually said, but something about us not having votes." 12 VRP (Apr. 6, 2023) at 1343.

When questioned by defense counsel, the reporting juror attempted to clarify further: "[B]asically that the democrats would get more votes if they allowed more immigration. . . . [A] generalized blanket statement that led me to believe that they could not be fair or impartial to any immigrants, not just your client." 12 VRP (Apr. 6, 2023) at 1345. The reporting juror clarified that they did not believe juror 2 was referring to Sadia specifically.

Sadia subsequently filed a motion to excuse juror 2 and replace them with an alternate juror. Sadia argued that the reporting juror provided "clear evidence that [juror 2] has clear bias regarding immigration and/or immigrants." CP at 102.

During a hearing on the motion to excuse juror 2, the trial court called juror 2 in for questioning. The following exchange occurred:

> THE COURT: . . . The Court has been provided with some information, and I just wanted to ask you about it. You are not in trouble.
> But I guess just to get directly to the point, did you make any comments about your thoughts on immigration policy, on QAnon or the validity of QAnon theories or anything of that nature?
> JUROR 2: No way.
> THE COURT: Did you make any comments about whether or not Democrats are trying to bring immigrants into the country to fill the voter [rolls] with people who would vote in favor of Democrats?
> JUROR 2: No.

17

13 VRP (Apr. 17, 2023) at 1364. Defense counsel asked juror 2 if they heard anyone else "making any comments" like the ones the trial court just described, and juror 2 responded, "No." 13 VRP (Apr. 17, 2023) at 1364. The State did not ask juror 2 any questions.

After juror 2 returned to the jury room, Sadia renewed her motion to excuse juror 2. The trial court denied Sadia's motion, explaining:

> I am convinced, having compared the credibility of . . . Juror Number 2 versus [the reporting juror]. I'm not convinced that [the reporting juror] was attempting to deceive the Court at all. . . . I am satisfied by a preponderance of the evidence that Juror Number 2's testimony is credible, and I am entering a finding . . . that Juror Number 2 did not make the comments that [the reporting juror] indicated were made by that juror.

13 VRP (Apr. 17, 2023) at 1433.

### b. Juror bias

Criminal defendants have a constitutional right to a fair and impartial jury under both our state and the federal constitutions. *State v. Talbott*, 200 Wn.2d 731, 737, 521 P.3d 948 (2022). The trial court has a duty to excuse from service any juror who "manifest[s] unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." RCW 2.36.110. Here, Sadia claims that seated juror 2 was biased against her because of her immigration status and national origin.

"[A]ctual bias" means "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2); *see also State v. Lawler*, 194 Wn. App. 275, 281, 374 P.3d 278 (published in part)

("[T]he trial court will excuse a juror for cause if the juror's views would preclude or substantially hinder the juror in the performance of his or her duties in accordance with the trial court's instructions and the jurors' oath."), *review denied*, 186 Wn.2d 1020 (2016). An "unequivocal statement[] indicating bias, without a subsequent assurance of impartiality, can establish actual bias." *State v. Smith*, 3 Wn.3d 781, 726, 555 P.3d 850 (2024). The record must demonstrate a probability, rather than "a mere possibility" of actual bias. *State v. Noltie*, 116 Wn.2d 831, 840, 809 P.2d 190 (1991).

Sadia's claim fails because the record does not support her argument that seated juror 2 was actually biased. As a preliminary point, we note that the alleged statements attributable to juror 2 were merely overheard by the reporting juror. In fact, the reporting juror could not recall exactly what juror 2 allegedly said and expressly informed the court that they were telling the trial court their own interpretation of juror 2's statements, not what juror 2 actually said. Finally, juror 2 explicitly denied, while under oath, making any such statements. Thus, the trial court denied the motion based on a credibility determination, and we do not review credibility determinations on appeal. *In re Det. of Pasley*, 28 Wn. App. 2d 823, 832, 538 P.3d 948 (2023), *review denied*, 3 Wn.3d 1009 (2024). Accordingly, the trial court did not err by denying Sadia's motion to excuse and replace juror 2.

3.    Former Officer Pitman's Credibility

Finally, Sadia appears to claim that Bryan Pitman was not a credible witness because his trial testimony was inconsistent with the statement he made at Sadia's sentencing. However, we do not review challenges to credibility. *Id.*[11] Thus, Sadia's claim fails.

CONCLUSION

Sadia's SAG claims fail. Therefore, we affirm Sadia's convictions. However, we strike the NCO imposed at sentencing and remand to the trial court to consider, on the record, whether to impose a NCO, taking into consideration Sadia's constitutional right to parent, explaining why a NCO is reasonably necessary to achieve the State's interest in protecting the defendant's children, and analyzing whether less restrictive alternatives exist.

---

[11] Regardless, there was no inconsistency as Sadia alleges. Pitman testified at trial that while he was employed as a police officer at the time of the incident, he "stop[ped] being an officer with the City of Fife" in 2021. 13 VRP (Apr. 17, 2023) at 1440. Pitman also spoke on behalf of the victims at sentencing. Pitman explained that the impact of investigating Sadia's crime so affected him that it "eventually . . . forced [him] to retire from a career" in law enforcement. 22 VRP (July 28, 2023) at 2550. There is nothing inconsistent between Pitman's statements, and Sadia does not explain how any alleged inconsistency would have impacted her trial.

No. 591481-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, J.

Veljacic, A.C.J.

21