# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON-

# DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>TYRONE D'ANGELO BABBS, JR.,<br><br>Appellant. | No.  59274-6-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, P.J. — Following a jury trial, Tyrone D. Babbs, Jr. appeals his convictions for second degree felony murder and first degree arson.  With regard to the second degree felony murder conviction, Babbs argues that the State failed to establish that he knowingly, intelligently, and voluntarily waived his *Miranda*[1] rights prior to a custodial interrogation, wherein he confessed to shooting and killing Jeremy Tomlinson.  With regard to the first degree arson conviction, Babbs argues that the State failed to satisfy corpus delicti and that his conviction rests solely on his uncorroborated confession during the custodial interrogation.

Regarding Babbs' second degree felony murder conviction, the record shows that law enforcement read Babbs his *Miranda* rights and that Babbs agreed to proceed with the interview, tracked the interview questions, provided coherent answers, and at no point requested to stop or ask for an attorney.  Thus, we hold that Babbs knowingly, intelligently, and voluntarily waived his rights.  Regarding Babbs' first degree arson conviction, because the State presented sufficient

---

[1]  *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

independent evidence corroborating Babbs' confession to burning down the trailer, we hold that the State satisfied corpus delicti. Therefore, we affirm Babbs' convictions for second degree murder and first degree arson.

FACTS

A. BACKGROUND

Babbs and Shalana "Lana" Atkinson were involved in an on-off romantic relationship starting around 2017 or 2018. In 2021, during an off-period with Babbs, Atkinson met and became romantically involved with Jeremy Tomlinson.

When Atkinson and Tomlinson started dating, they were unhoused and lived together in a tent. However, Atkinson subsequently sought and qualified for housing in a tiny home[2] as a single person. Due to COVID restrictions at the time, Atkinson was not allowed to bring guests to the tiny home. Atkinson and Tomlinson broke up shortly after Atkinson moved into the tiny home.

Atkinson also owned a fifth wheel trailer. It was parked on a dead-end street under a highway overpass behind a furniture bank. The area was a heavily populated homeless encampment with approximately 40 structures and 15 abandoned cars that people lived in. Atkinson split her time between the trailer and the tiny home. The trailer did not have electricity or running water. Instead, Atkinson would fill a water tank that she brought to the trailer. Additionally, Atkinson brought in a propane tank to power the refrigerator and stove inside the trailer.

---

[2] In this context, the tiny home was an "emergency micro shelter[] . . . not meant to be permanent." 5 Verbatim Rep. of Proc. (VRP) (Jan. 25, 2024) at 641.

A few months after Atkinson and Tomlinson broke up, Atkinson began dating Babbs again. Babbs, who was also unhoused, would routinely stay at Atkinson's trailer. In late December 2021, Tomlinson began contacting Atkinson via a social media messaging application. Tomlinson hoped to restart a romantic relationship with Atkinson. Atkinson informed Tomlinson that she did not wish to be involved with him.

Babbs was unhappy that Tomlinson was pursuing Atkinson. In a message to Atkinson regarding Tomlinson, Babbs wrote: "Damn babe I'm going to kill him whenever and wherever I see him [in] front of whoever I see him in front of ok babe." Ex. 90.

On January 1, 2022, Tomlinson again messaged Atkinson, but Atkinson rebuffed him. Tomlinson then threatened Atkinson that if she did not want to resume a relationship, he "was going to bring the devil back out." 5 Verbatim Rep. of Proc. (VRP) (Jan. 25, 2024) at 696. Atkinson sent a screenshot of Tomlinson's message to Babbs, expressing frustration about Tomlinson: "This dumba[**] really just keeps threatening me. I'm about to just put him on block." Ex. 90. Babbs replied:

> Babe just do it if he [tries] anything then I'll handle it babe . . . .
>
> . . . I'm going back to the trailer now and I will be there if he wants to show at all [I'm] [sic] shoot so he better not . . .
>
> Just tell him you and I are back together and he needs to back off.

Ex. 90.

On January 2, Babbs was at Atkinson's trailer. Atkinson joined him at the trailer shortly before 7:00 p.m. that evening. Then, at approximately 4:30 a.m. on January 3, Tomlinson went to the trailer. Tomlinson began banging on the trailer door and yelling, demanding that Atkinson

speak with him. According to Atkinson, Tomlinson was "angry, screaming. . . . He was pounding on the door trying to rip it open," which made Atkinson very frightened. 5 VRP (Jan. 25, 2024) at 715. Atkinson could not recall what ultimately led Tomlinson to stop banging on the door.

At approximately 4:40 a.m., security footage from the furniture bank showed activity around Atkinson's trailer—namely individuals walking back and forth with flashlights. Due to the angle of the security camera and distance from the trailer, the footage did not clearly show the individuals with flashlights or why they were outside Atkinson's trailer. Atkinson left the trailer alone at approximately 5:00 a.m.

Babbs messaged Atkinson at 5:15 a.m., asking, "[A]re you ok." Ex. 90. Atkinson asked Babbs to call her, though he did not appear to do so. At 5:49 a.m., Babbs messaged Atkinson again: "I'm changing my clothes and sh[**]. Any body [sic] call you yet about that I'm on my way back to clean up the house now babe." Ex. 90. Atkinson replied: "Stop msg me on here and nothing babe." Ex. 90. Then, around 8:30 a.m., Babbs messaged Atkinson: "Well ok babe I still need help with this fat a[**] n[****] babe." Ex. 90. Atkinson returned to the trailer around 10:00 a.m.

Throughout the morning and day of January 3, Babbs sent several messages to friends asking for help, saying he needed to move some "trash." Ex. 88. To one friend, Babbs wrote:

> My G I need your help with something but I don't want to talk about it on the phone can you help me w and it f [sic] so wear . . . work clothes or anything you can get rid of after and bring [an] extra set of clothes.

Ex. 84. To another friend, Babbs wrote: "I'll give you some sh[**] if you can get here and help me my n[****] it's my life on the line," and "It's my freedom G." Ex. 86. Babbs asked a third friend to bring "a roll of plastic or big black bags." Ex. 87.

One of Babbs' friends encouraged him to "erase all [his] messages just to be safe" and asked "Who is all around there because [if] the wrong person sees you its a rap [sic] I hope you erasing all these messages." Ex. 88. Babbs replied, "It's already a wrap bro too many people know about it already. Well all the ones that know I'll tell them they better not say sh[**] or they can end up just like him." Ex. 88. None of Babbs' friends came to assist Babbs.

Three days later, on the morning of January 6, the Tacoma Fire Department responded to reports of a fire at Atkinson's trailer. The fire department extinguished the fire, but almost nothing of the trailer remained. Atkinson was not present when the fire occurred.

After the fire was extinguished, the responding firefighters consulted with the fire department fire investigator. The firefighters had been unable to identify an ignition source. Additionally, the firefighters had checked the trailer and the trailer's exterior for a body but found nothing. Because the firefighters did not see anything out of the ordinary, the fire investigator determined it was unnecessary to investigate the fire further.

However, later that day, the same firefighter crew was called back to the homeless encampment because a "mound of some garbage items and plastic wraps and tarps," several feet away from the burned-out trailer, had caught fire. 3 VRP (Jan. 23, 2024) at 261. The crew found a body underneath the mound of garbage. The body was Tomlinson.

The medical examiner determined that Tomlinson had died from gunshot wounds to his face and thigh. Tomlinson's body had not been affected by the fire, and the fire investigator and responding police officers did not believe Tomlinson's death and the fires were related. A

responding officer noted several burn barrel[3] fires, with "flames coming out of the top of them," in the homeless encampment. 4 VRP (Jan. 24, 2024) at 442.

B.    INVESTIGATION

As the police investigated Tomlinson's death, Babbs became a person of interest. Tacoma police detective Ashley Robillard and her team obtained social media messages, including those described above, through warrants for several individuals, including Babbs, along with Babbs' internet search history records.

Babbs' internet search history revealed that on January 4, Babbs had searched several local news stations. In one of those searches, Babbs had clicked on an article regarding the discovery of a homicide victim in Tacoma.[4] Through Babbs' location records, law enforcement determined that Babbs' cell phone was in the area of the homeless encampment when Tomlinson was killed.

C.    BABBS' INTERVIEW

In April 2022, police arrested Babbs and brought him to police headquarters for an interview. Babbs was not handcuffed, but he was not free to leave. Detective Robillard and Detective Patricia Song interviewed Babbs in an interview room. The interview was videotaped. They offered Babbs a bathroom break and a glass of water. Babbs sat with his arms tucked in his shirtsleeves.

---

[3] A burn barrel is "like [a] 50 gallon metal-type drum[]" which can hold a fire for individuals to stay warm. 4 VRP (Jan. 24, 2024) at 442.

[4] The news article Babbs had clicked on was regarding an unrelated past homicide.

Detective Robillard then read from a police department form and advised Babbs of his *Miranda*[5] rights. Babbs confirmed that he understood. Babbs asked if he would be released after the interview or whether he was being arrested. Detective Robillard responded that she did not know yet and that was why the police had brought Babbs in for an interview.

Detective Robillard then asked if Babbs wished to voluntarily proceed with answering questions. Babbs replied, "Hell yeah because I need to know myself what's really going on." Ex. 94 (03:08-03:11). Babbs then signed the advisement of rights form. As Babbs signed the form, he stated he had used marijuana that day.

The interview lasted over two hours. At several points during the interview, Babbs mentioned he was scared. However, Babbs never asked for a break or for an attorney. During the interview, Babbs mentioned that he smoked meth and that he had smoked meth with Tomlinson on occasion.

Babbs spoke quickly during the interview, but his responses tracked the detectives' questions. Detective Robillard and Detective Song did not explicitly inquire if Babbs was under the influence of any drugs during the interview. However, based on Babbs' demeanor and responses, both Detective Robillard and Detective Song believed Babbs was oriented to time and place, and they did not have concerns regarding Babbs' comprehension.

While Babbs initially denied knowing anything about Tomlinson's death, he later admitted to shooting Tomlinson. Babbs stated that when Tomlinson had started pounding on the trailer door, he aimed a gun out the window and shot twice without actually seeing where Tomlinson

---

[5] *See generally Miranda*, 384 U.S. 436.

7

was. Babbs also stated that he lit Atkinson's trailer on fire with a torch. Babbs denied attempting to destroy any evidence inside the trailer; instead, he stated: "I don't even know why the f[***] I lit that on fire." Ex. 94 (1:40:55-1:40:58).

D.    PROCEDURAL HISTORY

The State charged Babbs with second degree murder (Count I), second degree felony murder (Count II), first degree manslaughter (Count III), first degree arson (Count IV), and unlawful possession of a firearm (Count V). The matter proceeded to a jury trial.

1.    CrR 3.5 Hearing

Prior to trial, the trial court held a CrR 3.5 hearing to determine the admissibility of statements Babbs made during his interview with Detective Robillard and Detective Song. *See* CrR 3.5. Detective Robillard and Detective Song testified to the facts of the interview described above. Detective Robillard stated that she did not make any threats or promises to Babbs and that she would have stopped the interview if Babbs had indicated he did not wish to talk. Detective Song corroborated Detective Robillard's statement.

The State also submitted Exhibit 6, a flash drive that contained a video recording of the interview, along with the police reports that Detective Robillard wrote following the interview.

The State argued that Babbs knowingly, intelligently, and voluntarily waived his *Miranda* rights, and that his statements during the interview should be admissible. The State stated that Babbs never unambiguously requested the interview to stop and that any confusion or statements

8

of fear Babbs expressed during the interview was based on the context in which he had been brought to the police station.[6]

Babbs' counsel argued that Babbs was under the influence of drugs during the interview. Babbs' counsel contended that in the interview video, Babbs "is acting and is seen to be acting as if he was on meth" because he was "jittery." 1 VRP (Jan. 18, 2024) at 58. Further, Babbs' counsel argued, Babbs admitted to having consumed marijuana. Therefore, according to Babbs' counsel, Babbs did not knowingly, intelligently, and voluntarily waive his rights.

The trial court did not issue an immediate ruling; instead, it decided to read the police reports and watch the entirety of the interview video footage separately. After the trial court reviewed the video footage, it ruled that Babbs made a knowing, intelligent, and voluntary waiver of his *Miranda* rights, and that his statements from the interview were admissible. In its ruling, the trial court stated in part:

> I did have the opportunity to review the entire interview, all two hours of it.
>
> On the recording, Mr. Babbs is advised that it is both audio and video recorded. He's also advised of his Miranda warnings, consistent with what is required. At the end of that advisement, he's asked if he would like to answer questions. He indicates that he would.
>
> There was reference to some drug use; however, after reviewing the interview in its entirety, it does not appear that he was affected or that his knowledge or ability to understand the conversation was affected or impacted by his drug use.
>
> I do believe that he made a knowing, intelligent and voluntary waiver of his Miranda rights. He never asked for an attorney, never asked to stop the conversation, indicated a willingness to answer questions.

---

[6] The State had obtained a search warrant for Babbs' tent and law enforcement picked him up directly from his tent.

> There were no threats made to him, no promises, no use of force that I saw.
>
> . . . .
>
> But other than that, . . . I think the main issue that [defense counsel] brought up was the drug use issue. And after watching the interview, I don't believe that it was impacting his ability to understand the conversation. He was able to track the questions, was providing very clear, coherent answers. So I will find that the statement comes in.

2 VRP (Jan. 22, 2024) at 91-92.

The trial court subsequently entered written CrR 3.5 findings of fact (FOF) and conclusions of law. Relevant to this appeal, FOF 7 and FOF 8 stated:

7) There was reference to some drug use, but it does not appear that Mr. Babbs was affected or his knowledge or ability to understand the conversation was impacted by drug use.

8) Mr. Babbs did make a knowing and voluntary waiver of *Miranda* rights. He did not ask for an attorney and willingly answered questions. No threats were made to elicit his statements.

Clerk's Papers (CP) at 424.

2. Verdict and Sentencing

During a multi-day trial, several witnesses testified to the facts discussed above. The jury was shown an edited video of Babbs' interview with Detective Robillard and Detective Song.

The jury acquitted Babbs of second degree murder as described in Count I. However, the jury found Babbs guilty of the remaining counts. The trial court later vacated the first degree manslaughter conviction (Count III) because it involved the same victim and the same transaction as in Babbs' conviction for second degree felony murder (Count II).

10

For the remaining convictions—second degree felony murder and first degree arson—the trial court sentenced Babbs to the high end of his standard sentencing range for a total confinement of 457 months.

Babbs appeals.

## ANALYSIS

Babbs argues that the trial court erred when it found that he knowingly, intelligently, and voluntarily waived his *Miranda* rights during his police interview. Additionally, Babbs argues that under the corpus delicti rule, there is insufficient evidence absent his confession during the police interview to sustain his first degree arson conviction.

### A. KNOWING, INTELLIGENT, AND VOLUNTARY WAIVER

#### 1. Legal Principles

CrR 3.5 governs the admissibility of an individual's statements to police during a custodial interrogation. *See generally* CrR 3.5; *State v. Piatnitsky*, 170 Wn. App. 195, 221, 282 P.3d 1184 (2012), *aff'd*, 180 Wn.2d 407, 325 P.3d 167 (2014), *cert. denied*, 574 U.S. 1081 (2015). "[T]he rule to be applied in confession cases is that findings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record." *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). We review de novo whether a trial court's conclusions of law are supported by its findings of fact. *State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 755, 294 P.3d 857, *review denied*, 178 Wn.2d 1019 (2013).

An individual in a custodial interrogation "must be informed that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the

presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning.'" *Piatnitsky*, 180 Wn.2d at 412 (quoting *Miranda*, 384 U.S. at 479). A person's confession during a custodial interrogation is voluntary and admissible "if made after the [person] has been advised concerning rights and the [person] then knowingly, voluntarily and intelligently waives those rights." *State v. Aten*, 130 Wn.2d 640, 663, 927 P.2d 210 (1996) (lead opinion of Smith, J.), 668-69 (concurring opinion of Madsen, J.).

The State bears the burden of demonstrating by a preponderance of the evidence that a person made a knowing and intelligent waiver of their rights. *State v. Mayer*, 184 Wn.2d 548, 556, 362 P.3d 745 (2015); *State v. Radcliffe*, 164 Wn.2d 900, 905-06, 194 P.3d 250 (2008). "To be knowing and intelligent, a waiver must be 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Mayer*, 184 Wn.2d at 558 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). "Even once waived, a suspect can invoke these rights at any point during the interview and the interrogation must cease." *Piatnitsky*, 180 Wn.2d at 412.

The voluntariness of a confession is based on the totality of the circumstances in which the confession was made. *Mayer*, 184 Wn.2d at 556. "Factors considered include a defendant's physical condition, age, mental abilities, physical experience, and police conduct." *Aten*, 130 Wn.2d at 664. A person's use of drugs at the time of a confession is also considered, but drug use does not necessarily render a confession involuntary. *Id.* "When a trial court determines a confession is voluntary, that determination is not disturbed on appeal if there is substantial evidence in the record from which the trial court could have found the confession was voluntary by a preponderance of the evidence." *Id.*

2.      Babbs Knowingly, Intelligently, and Voluntarily Waived His Rights

Babbs argues that the trial court erred when it found he made a knowing and voluntary waiver of his *Miranda* rights during his interview with Detective Robillard and Detective Song. Specifically, Babbs assigns error to the trial court's FOF 7 and FOF 8. Babbs contends the fact that he had consumed meth and marijuana, was jittery, and spoke in a rushed manner, all demonstrated he was under the influence at the time of the interview and unable to give a voluntary waiver. Babbs further contends that if not for the admission of his confession that he shot Tomlinson, the State would have been unable to prove beyond a reasonable doubt that he was the shooter. We disagree.

Here, the record shows that prior to any custodial interrogation, Detective Robillard advised Babbs of his *Miranda* rights. Detective Robillard read the rights directly from an advisement of rights form. Babbs confirmed that he understood. Detective Robillard then asked Babbs if he wished to proceed with the interview, and Babbs replied, "Hell yeah because I need to know myself what's really going on." Ex. 94 (03:08-03:11). Babbs then signed the advisement of rights form. Throughout the two-hour interview, Babbs never asked for an attorney or to stop the questioning.

Babbs argues that his statements about drug use and his general behavior indicated he was under the influence. He asserts that neither Detective Robillard nor Detective Song made any effort "to determine whether Babbs' substance use was impacting his ability to understand the important rights he was waiving." Br. of Appellant at 16. Therefore, according to Babbs, the State failed to meet its burden demonstrating he made a knowing and voluntary waiver.

13

The record shows that during the interview, Babbs mentioned both meth and marijuana use. Babbs stated he had smoked marijuana that day prior to the interview. However, his references to meth were general; he merely informed the detectives that he used meth generally, *not* that he had been using meth that day. Indeed, his statements do not give any indication when he last used meth. Regardless, while drug use is a factor when considering whether a confession has been voluntarily made, drug use does not necessarily render a confession involuntary. *Aten*, 130 Wn.2d at 664.

Babbs also mentioned feelings of confusion at various points during the interview. However, it is clear in the video recording that Babbs understood the detectives' questions and provided cogent and responsive answers. Also, during the CrR 3.5 hearing, both Detective Robillard and Detective Song testified that Babbs was oriented to time and place and that he appropriately tracked the conversation. Both detectives testified that during interviews, they look for signs of unusual behavior that would indicate an individual is under the influence and therefore could not provide voluntary responses. Neither detective believed Babbs to be impaired during his interview. Review of video footage of the interview supports the detectives' statements. Because Babbs did not appear to be impacted by any drug use, we hold that Babbs was able to voluntarily waive his rights.

FOF 7 stated: "There was reference to some drug use, but it does not appear that Mr. Babbs was affected or his knowledge or ability to understand the conversation was impacted by drug use." CP at 424. Although Babbs mentioned drug use during his interview, the evidence shows that Babbs tracked the conversation with Detective Robillard and Detective Song and provided

cogent responses. Thus, there is substantial evidence in the record to support the trial court's FOF 7.

FOF 8 stated: "Mr. Babbs did make a knowing and voluntary waiver of *Miranda* rights. He did not ask for an attorney and willingly answered questions. No threats were made to elicit his statements." CP at 424. As discussed above, the record supports that Babbs made a voluntary waiver of his *Miranda* rights. The record also shows that Babbs waived his *Miranda* rights knowingly. Babbs responded to every question asked by the detectives—even stating, "Hell yes" to express that he wished to answer questions—without once asking for a break or to stop. Detective Robillard and Detective Song never threatened Babbs, and Babbs did not ask for an attorney at any time during the interview. Thus, substantial evidence in the record supports the trial court's FOF 8 that Babbs' made a knowing and voluntary waiver of his rights. *Aten*, 130 Wn.2d at 664.

Babbs' challenge to FOF 7 and FOF 8 fails. The record shows that Babbs knowingly, intelligently, and voluntarily waived his *Miranda* rights, and his statements made during his interview with the detectives are admissible. Thus, the trial court did not err.

B.     CORPUS DELICTI—ARSON

1.     Legal Principles

Corpus delicti means "'body of the crime.'" *Id.* at 655 (quoting 1 McCORMICK ON EVIDENCE § 145, at 557 (John W. Strong ed., 4th ed. 1992). In Washington, "confessions or admissions of a person charged with a crime are not sufficient, standing alone, to prove the corpus delicti and must be corroborated by other evidence" because a confession alone "may be of questionable reliability." *Id.* at 655-57.

The purpose of the corpus delicti rule is to safeguard a person from an unjust conviction based on "'the possibility that the[ir] confession may have been misreported or misconstrued, elicited by force or coercion, based upon mistaken perception of the facts or law, or falsely given by a mentally disturbed individual.'" *Id.* at 657 (quoting *City of Bremerton v. Corbett*, 106 Wn.2d 569, 576, 723 P.2d 1135 (1986)). The corpus delicti rule "ensures that the specific crime described in an incriminating statement 'actually occurred.'" *State v. Sprague*, 16 Wn. App. 2d 213, 225-26, 480 P.3d 471 (2021) (quoting *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006)).

Under the corpus delicti rule, "[t]he State must present other independent evidence to corroborate a defendant's incriminating statement." *Brockob*, 159 Wn.2d at 328. The independent corroborating evidence may be direct or circumstantial. *State v. Boyer*, 200 Wn. App. 7, 15, 401 P.3d 396 (2017). If independent evidence supports both a hypothesis of guilt and a hypothesis of innocence, it is insufficient to serve as corroborating evidence. *Sprague*, 16 Wn. App. 2d at 226-27.

The Washington Supreme Court has recognized that the corpus delicti rule "operates primarily as a rule of sufficiency." *State v. Cardenas-Flores*, 189 Wn.2d 243, 260, 401 P.3d 19 (2017). The evidence need not establish corpus delicti beyond a reasonable doubt or even by a preponderance. *Id.* at 264. Under the rule, "the independent evidence 'is sufficient if it prima facie establishes the corpus delicti.'" *Boyer*, 200 Wn. App. at 15 (quoting *State v. Hummel*, 165 Wn. App. 749, 759, 266 P.3d 269 (2012)), *review denied*, 176 Wn.2d 1023 (2013)). Prima facie means "'evidence of sufficient circumstances [that] would support a logical and reasonable inference' of the facts sought to be proved." *Aten*, 130 Wn.2d at 656 (quoting *State v. Vangerpen*, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995)). We assume the truth of the State's evidence and

draw all reasonable inferences in the light most favorable to the State. *Cardenas-Flores*, 189 Wn.2d at 264; *Sprague*, 16 Wn. App. 2d at 226.

A corpus delicti challenge may be raised for the first time on appeal. *Cardenas-Flores*, 189 Wn.2d at 263. We review sufficiency of the independent evidence for purposes of corpus delicti de novo. *Sprague*, 16 Wn. App. 2d at 226.

A person is guilty of first degree arson if they knowingly and maliciously cause "a fire or explosion [that] damages a dwelling." RCW 9A.48.020(1)(b). "'The corpus delicti of the crime of arson consists of two elements: (1) that the building in question burned; and (2) that it burned as a result of the willful and criminal act of some person.'" *State v. Picard*, 90 Wn. App. 890, 901, 954 P.2d 336 (quoting *State v. Nelson*, 17 Wn. App. 66, 69, 561 P.2d 1093, *review denied*, 89 Wn.2d 1001 (1977)), *review denied*, 136 Wn.2d 1021 (1998). Generally, "'[w]here a building is burned, the presumption is that the fire was caused by accident or natural causes rather than by the deliberate act of the accused.'" *State v. Pfeuller*, 167 Wash. 485, 489, 9 P.2d 785 (1932) (quoting *State v. Pienick*, 46 Wash. 522, 525, 90 P. 645 (1907)); *accord Boyer*, 200 Wn. App. at 17. But "[o]pportunity and convincing proof of motive on the part of the accused to burn a residence are circumstances that may establish that the building burned as the result of the willful and criminal act of some person." *Picard*, 90 Wn. App. at 901. The corpus delicti of an arson can be proved by either direct or circumstantial evidence. *Id.*

2.      Sufficient Independent Evidence Corroborates Babbs' Confession

Babbs argues that apart from his statement that he set Atkinson's trailer on fire during his police interview, the State did not present sufficient evidence "to establish that the trailer fire was caused by a criminal act committed by Babbs." Br. of Appellant at 18. We disagree.

We must assess whether the independent evidence corroborates Babbs' incriminating statement that he set the fire that burned the trailer. *Brockob*, 159 Wn.2d at 328. The State must establish prima facie corroborating evidence; specifically, the State must present evidence that would support a logical and reasonable inference that the trailer burned and it did so as a result of Babbs' criminal act. *Picard*, 90 Wn. App. at 901. Prima facie evidence can be circumstantial. *Id.*

The record clearly shows that Atkinson's trailer burned down. Babbs does not dispute that this element of arson is met.

As for corroboration that the fire resulted from Babbs' willful and criminal act, the State argues that Babbs had both opportunity and motive to burn down the trailer. The State asserts Babbs' motive was demonstrated by his messages to various friends asking for assistance to clean up some "trash," which can be inferred as messages asking for help to cover up Tomlinson's murder. Ex 88. The State also points out that it was not until after Babbs sent those messages that the trailer, with Tomlinson's body in close proximity, burned down. Taken together, the State argues, the independent evidence "supports a logical and reasonable inference that a crime occurred." Br. of Resp't at 27. We agree.

The record shows that Babbs regularly stayed at Atkinson's trailer. Indeed, Babbs was at the trailer when Tomlinson arrived, and Babbs' location records obtained by law enforcement established that Babbs' cellphone was in the vicinity of the trailer when Tomlinson was killed. Thus, the record shows that Babbs had opportunity to access Atkinson's trailer. *Picard*, 90 Wn. App. at 901.

The record also shows that immediately following Tomlinson's death, Babbs sent messages to several people, including Atkinson, about "clean[ing] up" a mess and needing to move

some "trash." Ex. 90; Ex. 88. Babbs asked one friend to bring "a roll of plastic or big black bags." Ex. 87. These messages give rise to a logical and reasonable inference that Babbs was attempting to cover up evidence of Tomlinson's death. Moreover, it does not appear from the record that any of Babbs' friends came to assist Babbs with covering up the killing.

Atkinson's trailer burned down three days later. Tomlinson's death occurred near the trailer, and it is reasonable to infer that Babbs understood the trailer could easily have contained evidence of Babbs' presence in and around the trailer around the time of Tomlinson's death.

The responding firefighters did not initially discover Tomlinson's body when responding to the trailer fire. However, the same firefighters were called back later the same day to address a "mound of some garbage items and plastic wraps and tarps," within several feet of the burned-out trailer that had caught fire. 3 VRP (Jan. 23, 2024) at 261. The tarp had partial fire damage. Tomlinson's body was then discovered underneath the fire-damaged mound.

Based on the timing of the trailer fire, the nearby fire damage to the garbage mound that hid Tomlinson's body, Babbs' access to the area and likely desire to dispose of Tomlinson's body, and other evidence in the record discussed above, a logical and reasonable inference arises that Babbs set the trailer on fire in an effort to cover up Tomlinson's death and destroy evidence of his own involvement. *Aten*, 130 Wn.2d at 656; *Picard*, 90 Wn. App. at 901.

Babbs argues the independent evidence is insufficient because other facts equally demonstrate the trailer fire could have been caused "by accidental or natural causes." Br. of Appellant at 21. For instance, Babbs points to the presence of the burn barrel fires in the homeless encampment and the fact that Atkinson used a propane tank in her trailer to power the refrigerator and stove as possible ignition sources.

19

However, like in other sufficiency contexts, in viewing the evidence, we must construe all reasonable inferences in a light most favorable to the State. *Cardenas-Flores*, 189 Wn.2d at 264. While the firefighters were unable to identify an ignition source, there is no evidence to suggest the fire was a result of the propane tank, refrigerator, or stove inside the trailer. Furthermore, while the record shows that there were several large burn barrel fires in the homeless encampment, there is no evidence that any other structure or dwelling in the heavily populated encampment also caught fire. Indeed, it is notable that *only* Atkinson's trailer, and later the garbage mound that hid Tomlinson's body, out of the 40 structures and 15 cars in the vicinity, caught fire. Thus, a logical and reasonable inference arises that the fire did not begin as a result of an innocent accidental circumstance.

The purpose of corpus delicti is to protect defendants against unjust convictions based only on confessions with questionable reliability. *Aten*, 130 Wn.2d at 657. But here, the record includes additional evidence of arson corroborating Babbs' confession. In arson cases, "[o]pportunity and convincing proof of motive on the part of the accused to burn a residence are circumstances that may establish that the building burned as the result of the willful and criminal act of some person." *Picard*, 90 Wn. App. at 901. Here, viewing the evidence in the light most favorable to the State, the record establishes both Babbs' opportunity and convincing proof of his motive. Thus, we hold that the State presented sufficient independent evidence corroborating Babbs' confession to burning down the trailer.

## CONCLUSION

We affirm Babbs' convictions for second degree felony murder and first degree arson.

No. 59274-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Glasgow, J.

Price, J.

21